DAVIDOFF HUTCHER & CITRON LLP
*Attorneys for the (Alleged Involuntary) Debtor*
605 Third Avenue
New York, New York 10158
(914) 381-7400

Hearing Date: April 20, 2022
Hearing Time: 11:00 a.m.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------- x
                                                           :
In re                                                      :   Involuntary Chapter 7
                                                           :
LFH FOOD HALL OPERATING, LLC,                              :   Case No.: 22-22041 (SHL)
                                                           :
                                                           :
                        Debtor.                            :
                                                           :
---------------------------------------------------------- x

### NOTICE OF HEARING ON MOTION TO DISMISS THE INVOLUNTARY CHAPTER 11 CASE PURSUANT TO 11 U.S.C. § 303(b)(1) AND FED. R. CIV. PRO. 12(b) MADE APPLICABLE BY <u>FEDERAL RULE OF BANKRUPTCY PROCEDURE 1011(c)</u>

**PLEASE TAKE NOTICE,** that upon the filed Declaration of Robert Towers dated March 22, 2022 and the accompanying Memorandum of Law (collectively, the "Motion"), the Alleged Involuntary Debtor, shall move this Court, before the Honorable Sean H. Lane, United States Bankruptcy Judge, at the United States Bankruptcy Court, 300 Quarropas Street, White Plains, New York 10601 on April 20, 2022, at 11:00 a.m. in the forenoon of that day or as soon thereafter as counsel can be heard for an Order:

a) Dismissing this Involuntary Chapter 7 Petition pursuant to 11 U.S.C. § 303(i), Fed.R.Bankr.P. Rule 1011(c) as incorporating Fed.R.Civ.P. Rule 12(b), including but not limited to Fed.R.Civ.P. Rule 12(b)(1) and (6);

b) Abstaining from this case under 11 U.S.C. § 305; and

1

    c)  Awarding costs and attorney's fees pursuant to 11 U.S.C. § 303(i)(1), and punitive damages pursuant to 11 U.S.C. § 303(i)(2) for the bad faith filing of this Involuntary Petition;

**PLEASE TAKE FURTHER NOTICE,** that the Hearing will be held via zoom conference only. Participants are required to register their appearance by 4:00 PM the day before any scheduled Zoom® hearing at https://ecf.nysb.uscourts.gov/cgi-bin/nysbAppearances.pl

**PLEASE TAKE FURTHER NOTICE,** that the Motion is on file with the Bankruptcy Court at the Court's website www.nysb.uscourts.gov (login and password required) and may be obtained from the undersigned upon written request.

**PLEASE TAKE FURTHER NOTICE**, that objections, if any, to any of the relief requested in the Motion shall be made in writing, filed with the Court on the Court's Electronic Case Filing System at www.ecf.nysb.uscourts.gov (Login and password required) with a copy delivered directly to Hon. Sean H. Lane and served upon the undersigned no later than seven days prior to the Hearing date.

Dated: March 22, 2022
     New York, New York

                  DAVIDOFF HUTCHER & CITRON LLP
                  *Attorneys for the Alleged Involuntary Debtor*
                  605 Third Avenue
                  New York, New York 10158
                  Telephone: (914) 381-7400


                  BY: */s/ Robert L. Rattet*
                      Robert L. Rattet

DAVIDOFF HUTCHER & CITRON LLP                    *Hearing Date: April 20, 2022*
*Attorneys for Involuntary Debtor*                    *Hearing Time :11:00 a.m.*
605 Third Avenue
New York, NY 10158
(914) 381-7400
Robert L. Rattet, Esq.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
In re:                                                    Chapter 7
                                                          (Involuntary Proceeding)
LFH FOOD HALL OPERATING, LLC,
                                                          Case No. 22-22041 (SHL)

                                    Alleged Debtor.
-----------------------------------------------------------X

## DECLARATION OF ROBERT TOWERS IN SUPPORT OF MOTION SEEKING DISMISSAL OF THE INVOLUNTARY CHAPTER 7 PETITION PURSUANT TO 11 U.S.C SECTIONS 303 AND FED. R. CIV. PRO. 12(b) MADE APPLICABLE BY FEDERAL RULES OF BANKRUPTCY PROCEDURE 1011 AND 9014 OR IN THE ALTERNATIVE ABSTENTION UNDER 11 U.S.C. § 305(a)(1)

Robert Towers declares, under penalty of perjury pursuant to 28 U.S.C. § 1746 as

follows:

1.       I am the managing member of LFH Food Hall Operating, LLC. (the "Involuntary

Debtor"), and the President of Towers Hospitality Consulting, Inc. which entity is a shareholder

of the Involuntary Debtor. This Declaration is submitted by the alleged Involuntary Debtor in

support of its Motion, seeking dismissal of the Petitioning Creditor's involuntary Chapter 7

petition.

2.       The Debtor is a limited liability company, whose 100% managing member is

Liberty Food Project LLC. Jose Ortiz is the managing member of Liberty Food Project LLC. The

remaining members are Christian Pascal and Robert Towers. The previous managing member of

the Involuntary Debtor, Beechtree LLC, resigned on July 26, 2021.

3.       The one and only Petitioning Creditor, Summit Glory Properties LLC (the

1

"Petitioning Creditor" or "Summit") is a landlord seeking to evict the Involuntary Debtor for nonpayment of rent for use of a portion of a ground floor retail space located at 28 Liberty Street, New York, New York. (the "Premises"). Summit alleges that the Involuntary Debtor is in default under the lease for the Premises for arrears totaling approximately $6,493,072.15 and has requested in the state court a warrant of eviction among other relief.

4.      The Involuntary Debtor asserts that the liabilities sought in the Holdover Action (defined below), are identical to the amount as listed in the Involuntary Petition, are subject to a bonafide dispute, and are un-liquidated as to amount. The Involuntary Debtor's business and relations with its investors have been damaged by this improper proceeding. Additionally, this is a mere two-party dispute, disguised as an Involuntary Bankruptcy. There is only one petitioning creditor on the Petition, despite 17 creditors listed in the annexed list of creditors pursuant to Fed.R.Bankr.P. Rule 1003(b), and the required information concerning those creditors. See Exhibit 1 for the annexed Petition and a list of creditors pursuant to Fed.R.Bankr.P. Rule 1003(b). Thus, Petitioning Creditor is not eligible to file the Involuntary Petition. Therefore, the alleged Involuntary Debtor seeks the dismissal of the Involuntary Proceeding under 11 U.S.C. § 303(i) and Fed.R.Bankr.P. Rule 1011(c) as incorporated Fed.R.Civ.P. Rule 12 and especially Rule 12(b)(1).

5.      The alleged Involuntary Debtor is alternatively seeking abstention under 11 U.S.C. §305 on the basis of the fact that the Bankruptcy Court is not the appropriate forum to decide a landlord-tenant dispute.

## BACKGROUND

6.      Summit and the Involuntary Debtor entered into a lease agreement on or about December 31, 2018 with the Involuntary Debtor intending to construct and operate a cutting-edge food hall at the premises known as 28 Liberty Street a/k/a 28 Liberty, New York, NY 10005 (hereinafter referred to as "the Premises").

7.      The Premises of which the Debtor was to occupy was a part of the ground floor retail and the lower level, which all parties had hoped would be occupied by thriving commercial tenants.

8.      However, due to the COVID-19 pandemic, the parties' plans were derailed in that Summit would not have the thriving commercial tenants it anticipated. By the same token, the Involuntary Debtor would not have said tenants to serve at its food hall nor would there be clientele from surrounding office buildings to patronize the food hall.

9.      Naturally, this led to unanticipated financial issues to the detriment of both Summit and the Involuntary Debtor. The parties, therefore, began negotiating and eventually agreed to an amendment of the Lease on or about March 31, 2020, copy of the First Amendment of the Lease (hereinafter referred to as "First Lease Amendment") is attached hereto as Exhibit 2.

10.     Per the terms of the Parties' First Lease Amendment, the Involuntary Debtor would construct the food hall with Summit contributing towards the hard and soft costs of the construction. Towards that end, the Involuntary Debtor hired G Builders, LLC, as a construction manager.

11.     The Parties' First Lease Amendment called for Summit to provide 50% of the funding for construction (see Section 4.2 of the First Lease Amendment attached hereto as Exhibit 2).

3

12.     In addition to providing a portion of the hard and soft costs of constructing the food hall, Summit agreed to provide access to Builders in order for them to perform pre-construction work. Eventually, Summit, per the agreement, would be called upon to provide access for the commencement of construction.

13.     Despite the parties' First Lease Amendment, Summit never provided the agreed upon funding. At most, Summit contributed 20% of soft costs and none of hard costs. This is an alleged breach of the First Lease Amendment.

14.     Despite the parties' First Lease Amendment, Summit also failed to provide certain necessary access to G Builders. Thus, Summit prevented the construction of the food hall in further breach of the First Lease Amendment.

15.     Between on or about July 19, 2021, and on or about November 4, 2021, there were no less than twenty internal meetings and/or interactions between the partners of the Involuntary Debtor as well as meetings with the representatives of Summit with an emphasis towards rescuing the struggling food hall venture.

16.     On or about September 9, 2021, the Parties, with the understanding that the unprecedented and continuing nature of the pandemic had drastically altered plans going forward, began negotiating yet another alteration of the initial lease agreements (hereinafter "Modification to Lease Agreement 2"). A copy of the Modification to Lease Agreement 2 is attached hereto as Exhibit 3.

17.     The Parties' proposed Modification to Lease Agreement 2 contemplated the restructuring of payments so that the food hall could move forward successfully and to the mutual benefit of the Involuntary Debtor and Summit.

18.     The essence of the Parties' Modification to Lease Agreement 2 was agreed to with

the only significant hold up being how to define the deferred payments. The Involuntary Debtor could not agree to represent payments as deferred rent. However, for all intents and purposes the alleged rent due would have been paid back pursuant to an agreed upon schedule by the Modification to Lease Agreement 2's terms.

19.      Specifically, the alleged rent owed would have been paid back as additional payments starting 5 years after the opening of the food hall.

20.      Tom Costanzo, Summit's representative, agreed orally to a modification of the Lease Agreement on or about September 2021 during a conference call in which I participated along with Tom Costanzo, Jason Berkeley and Isabella Chen. The key terms of the oral modification were as follows: a) there would be no rent until the food hall opened and no action would be taken to collect against the Guarantor, b) any past accumulated rent that was due would be paid in five years after the food hall opened and would be amortized over a number of years, c) rent, starting with the opening of the lease, would begin on a percentage basis until such time as it could be determined that certain occupancy goals (for both for the Premises as well as the surrounding downtown area) could be met, d) at the point where the occupancy threshold was reached, the Parties would transition to a fixed rent everywhere except the front passthrough area which would continue on a percentage basis (at 8%).

21.      These changes and others were discussed in a recent meeting with Mr. Costanza. In furtherance of these discussions, Mr. Costanza requested a five-year cash flow projection, which was provided.

### THE DEBT TO SUMMIT IS MATERIALLY DISPUTED AND IS CONTINGENT AS TO LIABILITY

22.　　Summit admitted in writing that the liability for rent was deferred until the contingency of opening happened. Thus, the debt cannot be characterized as undisputed or noncontingent.

23.　　In this connection, Tom Constanzo, via email directed to myself and a few others, stated: "We have always agreed to the concept of delaying rent until opening." This demonstrates that, in principle, the Parties had an understanding that rent would not come due until the opening of the food hall. The issues that remained regarding rent were largely semantic. A copy of said email from Tom Constanzo is attached hereto as Exhibit 4.

24.　　Summit responded with an alternative proposal of a three-year payout of deferred rent, and an 18% percentage rent as opposed to 8%. **Nowhere was it contemplated that all rent was immediately due as a fixed, non-contingent obligation of the Debtor.**

25.　　The Holdover Action (defined below) was on the Court's Part 52 calendar for February 8, 2022. Rather than awaiting the Landlord & Tenant Court's proceeding which it had already filed on its own behalf, Summit filed the Involuntary Petition.

26.　　On or about January 31, 2022, Summit filed an instant Involuntary Petition for relief under Chapter 7 of the Bankruptcy Code.

27.　　The Petition is nothing more than a meritless and bad faith filing. The alleged Involuntary Debtor asserts that the petition was filed, upon information and belief, for a multitude of non bankruptcy purposes, relating to its landlord-tenant dispute with Summit, and to effectively evict the Involuntary Debtor through a forced liquidation.

28.　　The following action landlord-tenant action was commenced on January 11, 2022, is now pending in the New York County Civil Court:

a.  <u>Summit Glory Property LLC v. LFH Food Hall Operating, LLC, Index No. LT-300566-22.</u> (the "Holdover Action").

29.    This Involuntary Petition was then filed twenty (20) days later on January 31, 2022. It was filed for the sole purpose of seeking a back door for an eviction of the Involuntary Debtor and bypassing the jurisdiction of the Holdover Action.

30.    The Involuntary Debtor has not filed an answer yet in the Holdover Action.

31.    11 U.S.C §303(b)(1) clearly states: An involuntary case against a person is commenced by the filing with the bankruptcy court of a petition under chapter 7 or 11 of this title:

> **by three or more entities**, each of which is either a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount, or an indenture trustee representing such a holder, if such noncontingent, undisputed claims aggregate at least $10,000 [1] more than the value of any lien on property of the debtor securing such claims held by the holders of such claims

32.    The debt is materially contested and disputed. As a result of the Covid-19 pandemic, virtually all significant lease transactions that were pending before and during the pandemic have been modified, in writing, or by course of conduct. Operations during much of the period after March 11, 2020, when the pandemic formally began, and for almost two years thereafter, were legally impossible or seriously constricted. It is the province of a court having knowledge of local tenancy conditions to determine whether the debt to a Petitioning Creditor is in fact due and owing.

33.    The Bankruptcy Court is also not the kind of specialized tribunal to determine landlord-tenant issues; the New York County Civil Court is the more appropriate forum.

34.    The alleged Involuntary Debtor is seeking the following additional and further

relief: the entry of an order pursuant to 11 U.S.C. §303 (i), costs, attorneys' fees, damages proximately caused by the filing, and punitive damages, in an amount deemed just by this Court pending a further hearing.

35.    The alleged Involuntary Debtor asserts again that this is a mere two-party dispute disguised as an involuntary bankruptcy case. On January 11, 2022, the Petitioning Creditor commenced the Holdover Action.

36.    However, by filing this instant matter, notwithstanding the clear provisions of the First Lease Amendment  (Exhibit "2"), the Modification to Lease Agreement 2 (Exhibit 3), its emails stating rent would not come due until the food hall opens (Exhibit 4), and its representative's oral agreement with LFH (see paragraph 20 supra) Summit, by filing this Involuntary Bankruptcy as the sole petitioning creditor misrepresents to this Court that its claim "is not contingent as to liability or the subject of a bona fide dispute as to liability or amount." Summit's claim is in bonafide dispute as to liability, and the payment of this debt is entirely contingent upon the food hall opening.

37.    Due to the COVID-19 pandemic, the building is currently only 10-15% occupied. This has been represented to us by Tom Constanzo. During the time that the food hall was anticipated to open, the building had even less occupancy than it does today. This has frustrated the purpose of the Parties' lease agreement.

38.    Upon examination of the petition, there is only one petitioning creditor (Summit), with 17 creditors listed in the annexed schedule. (See Exhibit "1"). 11 U.S.C. §303 clearly proscribes that when there are more than 12 scheduled creditors, there must be at least 3 petitioning creditors on the involuntary petition. Since there is only one petitioning creditor with a claim subject to a bonafide dispute, the petition should be dismissed.

## **THE INVOLUNTARY FILING HAS SERIOUSLY INJURED THE DEBTOR**

39.     The Involuntary Debtor must now defend itself in this bankruptcy proceeding, which has negatively impacted its businesses and taken away resources from important day to day operations.

**40.     As a result of the filing, our investors and vendors are having second thoughts about continuing with our business.** It is highly problematic for an alleged Involuntary Chapter 7 Debtor to seek investment financing.

41.     In fact, the alleged Involuntary Debtor had been prepared to open its business with cooperation from lenders and investors.

42.     If the alleged Involuntary Debtor cannot conduct business in a normal manner as a result of the involuntary filing, the alleged Involuntary Debtor, and its constituencies will suffer grievous injury.

43.     This involuntary filing has also affected affiliated companies in a highly negative manner and has tarnished my previously good business reputation throughout the industry.

44.     Therefore, the Involuntary Debtor respectfully submits that dismissal and sanctions are both appropriate and warranted.

45.     It appears, as if or upon information and belief, that the primary motives of the Petitioning Creditor are to be to gain leverage against the alleged Involuntary Debtor in the Holdover. This impermissible litigation tactic has caused the Involuntary Debtor severe losses in business and with its investors.

## **ABSTENSION BY THE COURT IS APPROPRIATE**

46.     There is no showing of the necessity for the Bankruptcy Court's jurisdiction in order to correctly administer this matter.

47.     The Court should note that even the mere filing of an involuntary petition has caused serious damage. As discussed above, a result of the filing is that the Involuntary Debtor's business as a going concern is seriously threatened, as is its relationship with its investors.

48.     There is no question that a bankruptcy filing complicates the environment in which a Debtor conducts its business. Abstention is appropriate where the injury caused to the alleged Involuntary Debtor is needless; the Petitioning Creditor has effective remedies outside of bankruptcy and as set forth above the filing is improper.

49.     The alleged Involuntary Debtor believes that it should not be possible for disputed creditors, motivated by reasons other than the fair treatment of creditors, to seek to involuntarily subject the alleged Involuntary Debtor to a bankruptcy proceeding.

50.     Thus, the balance of harms weighs in favor of the Court abstaining from this case as an alternative to dismissal.

**(Remainder of page intentionally left blank)**

**WHEREFORE,** the alleged Involuntary Debtor seeks all the relief sought in the within

the declaration, together with such other and further relief as is just under the circumstances.

Dated: March 21, 2022

ROBERT TOWERS

EXHIBIT "1"

28 Liberty Street
Vendor Balances

3/1/2022

### Design Development & Soft Costs

| | Company | First Name | Last Name | Address | City | State | Zip | Business Phone | Email | Open Balance |
|---|---|---|---|---|---|---|---|---|---|---|
| Owner's Rep | Stys Hospitality Initiative | Brian | Stys | 29 Farragut Road | Boston | MA | 2127 | (617) 839-6181 | bstys@styshospitality.com | $ 98,050.00 |
| Interior Designer | Jeffrey Beers International | Jeffrey | Beers | 250 Greenwich Street | New York | New York | 10007 | (212) 352-2020 | jbeers@jeffreybeers.com | $ 380,969.50 |
| Elevator Consultant | Edgett Williams Consulting Group | Erv | Lauterbach | 1177 Avenue of the Americas | New York | New York | 10036 | (917) 580-6111 | erv@ewcg.com | $ 16,672.50 |
| Chef | Project Harns | Glenn | Harns | 10 Jagger Lane | West Hampton | New York | 11977 | (212) 420-9800 | glenn@projectharns.com | $ 45,000.00 |
| Architect of Record | Howell Belanger Castelli Architects PC | Raffaele | Castelli | 122 West 27th Street | New York | New York | 10001 | (212) 647-0011 | ralphc@hbcarch.com | $ 103,500.00 |
| Alt 1 Architect of Record | Gensler and Associates Architects | Michael | Gatti | 1700 Broadway, #400 | New York | New York | 10020 | 212 492-1480 | michael_gatti@gensler.com | $ 12,815.00 |
| Exhaust Consultant | Jaros, Baum & Bolles | Mohammad | Ali | 80 Pine Street | New York | New York | 10005 | (212) 530-9300 | alim@jbb.com | $ 15,550.00 |
| Low Voltage Consultant | JDAV Design | Gabriel | Karlis | 120 Broadway | New York | New York | 10271 | (701) 461-7475 | gabriel@jdavdesign.com | $ 8,655.57 |
| MEP Engineer | MG Engineering, PC | Thomas | Fields | 116 W 32nd Street | New York | New York | 10001 | 212-643-9055 | thomas.fields@meedpc.net | $ 135,596.95 |
| Expeditor | Milrose Consultants Corp | Pansa | Shahbazi | 498 Seventh Ave | New York | New York | 10018 | (212) 643-4545 | pshahbazi@milrose.com | $ 5,000.00 |
| Kitchen Designer | Next Step Design Food Service Consultants | Nancy | Kadonoff | 913 West Street | Annapolis | Maryland | 21401 | (410) 263-1200 | nkadonoff@nextstepdesign.com | $ 50,000.00 |
| Lighting Designer | Reveal Design | Dilnoza | Khalilova | 150 West 28th Street | New York | New York | 10018 | (212) 633-4353 | dkhalilova@revealdesigngroup.com | $ 11,790.03 |

### Construction Costs

| | Company | First Name | Last Name | Address | City | State | Zip | Business Phone | Email | Open Balance |
|---|---|---|---|---|---|---|---|---|---|---|
| Plumber | A&M Warshaw Plumbing & Heating | Mike | Warshaw | Inc. 575 Lexington Avenue, 14th Floor | New York | New York | 10022 | (212)343-0101 | mwarshaw@amwarshawplumbing.com | 56,250.00 |
| General Contractor | G Builders II LLC | George | Figliolia | 45 Broadway 4th Floor | New York | New York | 10006 | (212) 981-2920 | gifigliolia@gbuilders.com | $ 1,096,890.79 |
| HVAC / Mechanical Contractor | Hydro Air Mechanical LLC | Frank | DiCiglio | 54-02 35th Street | Long Island City | New York | 11101 | (718) 391-0100 | frank@hydroairmechanical.com | $ 274,500.00 |
| Kitchen Equipment Operator | Legends | Richard | Porteus | 61 Broadway | New York | New York | 10006 | (212) 602-4070 | richardporteus@legends.net | +/- $1,000,000 |
| Millwork Contractor | Robert Design Group Ltd. | Kazimierz | Stachelek | 1711 Aimco Blvd Mississauga | Ontario | | L4W 1N7 | (905)624-7345 | kaz@rdgl.ca | $ 181,097.50 |

EXHIBIT "2"

FILED: NEW YORK COUNTY CLERK 11/10/2021 12:14 PM
NYSCEF DOC. NO. 3

22-22041-shl    Doc 9    Filed 03/21/22    Entered 03/21/22 16:30:07    Main Document
Pg 17 of 57

INDEX NO. 656420/2021
RECEIVED NYSCEF: 11/10/2021

Exhibit 2

FILED: NEW YORK COUNTY CLERK 11/10/2021 12:14 PM
NYSCEF DOC. NO. 3

INDEX NO. 656420/2021
RECEIVED NYSCEF: 11/10/2021

22-22041-shl   Doc 9   Filed 03/21/22   Entered 03/21/22 16:30:07   Main Document
Pg 18 of 57

THIS FIRST AMENDMENT OF LEASE (this "**Agreement**") dated March 31, 2020 between **SUMMIT GLORY PROPERTY LLC**, a Delaware limited liability company with offices at 28 Liberty Street, New York, New York 10005 (hereinafter called "**Landlord**") and **LFH FOOD HALL OPERATING, LLC**, a New York limited liability, having an office at 1133 Westchester Avenue, S-221, White Plains, New York 10604 (herein called "**Tenant**").

W I T N E S S E T H:

WHEREAS, pursuant to that certain Agreement of Lease dated as of December 31, 2018 (the "**Lease**") between Landlord and Tenant, Landlord leased to Tenant and Tenant leased from Landlord certain premises located on the ground floor and lower level 1 in the building known as 28 Liberty Street, New York, New York (hereinafter called the "**Building**"). Such premises as more particularly described in the Lease are herein referred to as the "**demised premises**"; and

WHEREAS, Landlord and Tenant desire to amend and modify the Lease to provide for modification of the demised premises, and to otherwise amend and modify the Lease in certain other respects, all as more particularly set forth in this Agreement.

NOW, THEREFORE, in consideration of the agreements herein contained and other good and valuable consideration, receipt of which is hereby acknowledged, the parties hereto agree as follows:

ARTICLE 1

TERMS

Section 1.1.    Except as otherwise defined herein, all terms used in this Agreement shall have the meanings provided in the Lease. The phrases "**this Lease**" or "**the Lease**" as used in the Lease shall mean the Lease as amended and modified pursuant to this

Agreement and as the same may be amended, modified and extended from time to time. All capitalized terms not otherwise defined in this Agreement shall have the meaning ascribed to such term in the Lease.

## ARTICLE 2

## MODIFICATION OF DEMISED PREMISES; PASS-THROUGH AREA; REQUIRED HOURS OF OPERATION

Section 2.1.   Notwithstanding anything to the contrary contained in the Lease, the demises premises shall be deemed to consist of the those portions of ground floor (i.e., Ground Floor Retail Space) and Lower Level 1 (i.e., Lower Level 1 Space) of the Building substantially as shown as the area with the diagonal lines through it on the floor plans annexed hereto as Exhibit A-1 (the "Ground Floor Plan") and Exhibit A-2.   Accordingly, Exhibit A annexed to the Lease is hereby deleted and replaced with Exhibit A-1 and Exhibit A-2 annexed hereto.

Section 2.2.   Notwithstanding anything contrary contained in the Lease, including Section 45.2(d), the portion of the demised premises delineated as the "Pass-Through Area" on the Ground Floor Plan shall remain open to the general public during the Required Hours of Operation; it being understood agreed that the Pass Through Area shall be free of any obstructions other than seating and food and beverage related structures, contain either retractable walls or glass walls with doors, and shall remain open wall to wall consistent with the current dimensions during the Required Hours of Operation.   Furthermore, the design of the retractable walls or glass walls with doors that constitute the two entranceways (as shown on the Ground Floor Plan) to the Pass-Through Area shall be determined by Tenant's design team but the construction and installation of same shall otherwise be subject to the provisions of Article 8

2

of the Lease.  After the Required Hours of Operation, Tenant shall be permitted to, subject to applicable Legal Requirements, close off and secure the Pass-Through Area from the general public.

Section 2.3.    The "Required Hours of Operation" as defined in Section 45.2(d) of the Lease is hereby modified to mean (i) 7:00 a.m. to 11:00 p.m. on all Sundays, Mondays, Tuesdays, Wednesdays and Thursdays  that are not Holidays or Permitted Closures, and (ii) 7:00 a.m. to midnight on all Fridays and Saturdays that are not Holidays or Permitted Closures.

Section 2.4.    The second clause (ii) appearing in Section 2.1 of the Lease is hereby restated in its entirety as follows:

> "Subject to the provisions of this Lease (including this Section 2.1 and Section 2.5), and otherwise to extent compliant with Legal Requirements, (i) Tenant shall also be permitted to have temporary seating (tables and chairs) on the Designated Plaza Space, and (ii) Tenant may from time to time (but not more often than twelve (12) times per year during weekdays (and an additional twelve (12) times per year on weekends), for in either case, periods not to exceed twenty-four (24) hours), use a portion of the demised premises (not to exceed 25% of the usable area thereof, so that 75% of the usable area remains open) and/or the Designated Plaza Space for private parties and events; it being understood and agreed that if Tenant desires to exceed the twelve (12) times limitation on weekends, Landlord shall not unreasonably withhold its consent to any such request by Tenant."

ARTICLE 3

MODIFICATION OF FIXED ANNUAL RENT AND ADDITIONAL RENT

Section 3.1.    Section 1.1(a) of the Lease is hereby modified in its entirety to read as follows:

"1.1  (a) Tenant shall pay to Landlord a fixed annual rent (herein called "**fixed annual rent**") as follows:

With respect to the Ground Floor Retail Space:

(i)    Three Million Eight Hundred Forty Thousand One Hundred and 00/100 Dollars ($3,840,100.00) per annum ($320,008.33 per month) for the period commencing on the Rent Commencement Date and ending on the last day of the month in which

3

occurs the day immediately preceding the third (3rd) anniversary of the Rent Commencement Date (herein called the "**1st Rental Period**");

(ii)    Four Million One Hundred Eight-Five Thousand Seven Hundred Eight and 96/100 Dollars ($4,185,708.96) per annum ($348,809.08 per month) for the period commencing on the day immediately following the last day of the 1st Rental Period and ending on the last day of the month in which occurs the day immediately preceding the sixth (6th) anniversary of the Rent Commencement Date (herein called the "**2nd Rental Period**");

(iii)    Four Million Five Hundred Sixty-Two Thousand Four Hundred Twenty-Two and 80/100 Dollars (4,562,422.80) per annum ($380,201.90 per month) for the period commencing on the day immediately following the last day of the 2nd Rental Period and ending on the last day of the month in which occurs the day immediately preceding the ninth (9th) anniversary of the Rent Commencement Date (herein called the "**3rd Rental Period**");

(iv)    Four Million Nine Hundred Seventy-Three Thousand Forty and 84/100 Dollars ($4,973,040.84) per annum ($414,420.07 per month) for the period commencing on the day immediately following the last day of the 3rd Rental Period and ending on the last day of the month in which occurs the day immediately preceding the twelfth (12th) anniversary of the Rent Commencement Date (herein called the "**4th Rental Period**");

(v)    Five Million Four Hundred Twenty Thousand Six Hundred Fourteen and 56/100 Dollars ($5,420,614.56) per annum ($451,717.88 per month) for the period commencing on the day immediately following the last day of the 4th Rental Period and ending on the last day of the month in which occurs the day immediately preceding the fifteenth (15th) anniversary of the Rent Commencement Date (herein called the "**5th Rental Period**");

(vi)    Five Million Nine Hundred Eight Thousand Four Hundred Sixty-Nine and 88/100 Dollars ($5,908,469.88) per annum ($492,372.49 per month) for the period commencing on the day immediately following the last day of the 5th Rental Period and ending on the last day of the month in which occurs the day immediately preceding the eighteenth (18th) anniversary of the Rent Commencement Date (herein called the "**6th Rental Period**"); and

(vii)    Six Million Four Hundred Forty Thousand Two Hundred Thirty-Two and 12/100 Dollars ($6,440,232.12) per annum ($536,686.01 per month) for the period commencing on the day immediately following the last day of the 6th Rental Period and ending on Expiration Date (the "**7th Rental Period**").

LEGAL_US_E # 145073564.12 92764.00025

FILED: NEW YORK COUNTY CLERK 11/10/2021 12:14 PM
NYSCEF DOC. NO. 3

INDEX NO. 656420/2021

RECEIVED NYSCEF: 11/10/2021

22-22041-shl    Doc 9    Filed 03/21/22    Entered 03/21/22 16:30:07    Main Document
Pg 22 of 57

<u>With respect to the Lower Level 1 Space:</u>

(viii)    Three Hundred Fifty-Three Thousand Eight Hundred Twenty-Five and 04/100 Dollars ($353,825.04) per annum ($29,485.42 per month) during the 1st Rental Period;

(ix)    Three Hundred Eighty-Five Thousand Six Hundred Sixty-Nine and 20/100 Dollars ($385,669.20) per annum ($32,139.10 per month) during the 2nd Rental Period;

(x)    Four Hundred Twenty Thousand Three Hundred Seventy-Nine and 44/100 Dollars (420,379.44) per annum ($35,031.62 per month) during the 3rd Rental Period;

(xi)    Four Hundred Fifty-Eight Thousand Two Hundred Thirteen and 64/100 Dollars ($458,213.64) per annum ($38,184.47 per month) during the 4th Rental Period;

(xii)    Four Hundred Ninety-Nine Thousand Four Hundred Fifty-Two and 84/100 Dollars ($499,452.84) per annum ($41,621.07 per month) during the 5th Rental Period;

(xiii)    Five Hundred Forty-Four Thousand Four Hundred Three and 64/100 Dollars ($544,403.64) per annum ($45,366.97 per month) during the 6th Rental Period; and

(xiv)    Five Hundred Ninety-Three Thousand Four Hundred and 00/100 Dollars ($593,400.00) per annum ($49,450.00 per month) during the 7th Rental Period."

Section 3.2.    The reference to "$1,859,017.00" as the aggregate abatement in fixed annual rent set forth in Section 1.13 is herein deleted and replaced with "$2,096,962.50".

Section 3.3.    Section 4.1(e) of the Lease shall be deemed modified in its entirety to read as follows:

"(e) The term "**The Tax Percentage**" for purposes of computing tax escalation shall mean one and seventy-six hundredths percent (1.76%), which has been computed based on a fraction, expressed as a percentage, the numerator of which is the usable square footage of the demised premises, and the denominator of which is the useable square footage for the entirety of the Building (excluding mechanical space). The parties hereby stipulate for purposes of this Lease that (i) the number of usable square feet within the demised premises shall be deemed to be 39,026, and (ii) the number of usable square feet within the Building (including retail space but excluding mechanical space) shall be deemed to be 2,215,028, based on Landlord's current measurement methodology used in the Building."

LEGAL_US_E # 145073564.12 92764.00025

Section 3.4.    Notwithstanding anything to the contrary contained in Section

4.2(a) of the Lease, Tenant's obligation to make Tax Payments shall commence on January 1,

2021; it being understood and agreed that Tenant shall have no obligation to make any Tax

Payments with respect to the period prior to January 1, 2021.

Section 3.5.    All references to the term "Delivery Date" appearing in Section

5.1(c) of the Lease are hereby modified to read "Rent Commencement Date", and Section 5.1(b)

of the Lease shall be deemed modified in its entirety to read as follows:

> " (b)    The term **Stipulated Operating Payment**" shall mean: (i) for calendar
> year commencing on January 1, 2021, $234,156.00, and (ii) for each calendar
> year thereafter occurring during the Term, the product obtained by multiplying (x)
> the Stipulated Operating Payment for the immediately preceding calendar year by
> (y) 103%. Thus, for example, the Stipulated Operating Payment for the first
> calendar year following the calendar year in which the Rent Commencement Date
> occur shall be $241,180.68 (i.e., $234,156.00 x 103%), and the Stipulated
> Operating Payment for the immediately following calendar year thereafter shall
> be $248,416.10 (i.e., $241,180.68 x 103%)."

ARTICLE 4

WORK ALLOWANCE; LANDLORD'S WORK; ELEVATOR WORK

Section 4.1.    Section 3.2(a) of the Lease is hereby modified so the reference to

the Work Allowance therein in the amount of "Nine Million One Hundred Thousand Twenty-

Five and 00/100 ($9,100,025.00) Dollars" is deleted and replace with "Nine Million Three

Hundred Seventy-Six Thousand One Hundred Fifty and 00/100 ($9,376,150.00) Dollars".

Section 4.2.    Notwithstanding anything to the contrary in the Lease, based on

Work Allowance requisitions submitted by Tenant to Landlord on or before February 28, 2020 in

the aggregate amount of $726,193.00, for which Landlord agrees there has not been any Work

Allowance advance, Landlord shall advance to Tenant:  (i) Three Hundred Thirty-One Thousand

Two Hundred Forty-Three and 00/100 Dollars ($331,243.00) within thirty (30) days after (or

sooner if Landlord's payment procedures can accommodate) the date of this Agreement;  (ii)

6

One Hundred Thirty-One Thousand Six Hundred Fifty and 00/100 Dollars ($131,650.00) within

thirty (30) days after (or sooner if Landlord's payment procedure can accommodate) Tenant's

submission to Landlord of a coordinated set of completed schematic design drawings from the

production architect that are a further developed set of drawings more complete and detailed than

the concept design set previously provided to Landlord by Tenant's design architect on

December 12, 2019 (which coordinated schematic design set must include preliminary MEP

designs that are coordinated with the architectural drawings); and (iii) Two Hundred Sixty-

Three Thousand Three Hundred and 00/100 Dollars ($263,300.00) within thirty (30) days after

(or sooner if Landlord's payment procedures can accommodate) Tenant's submission to

Landlord of a fully executed Construction Contract (as defined below).  Notwithstanding that

Tenant has yet to furnish Landlord with a fully executed construction contract setting forth the

Contract Price for Tenant's Initial Work (a "**Construction Contract**"), in addition to the Work

Allowance advances described in the immediately preceding sentence, and until such executed

Construction Contract is furnished to Landlord, Landlord shall advance to Tenant fifty percent

(50%) of the amount of any Work Allowance requisition made after February 28, 2020 that

satisfies the requirements of Section 3.2 of the Lease, including taking into account the 15%

limitation on Soft Cost and Tenant providing Landlord with all documentation required pursuant

to Section 3.2(b) of the Lease, other than the requirement to have a fully executed Construction

Contract and the methodology for calculating the pro rata portion of any requisition for which

Landlord is obligated to fund from the Work Allowance.  At such time as Tenant enters into a

Construction Contract, the disbursement of the balance of the Work Allowance for requisitions

made after the date of the Construction Contract shall be made in accordance with Section 3.2 of

the Lease as unmodified by this Section 4.2; provided that for the purpose of determining the pro

7

rata portion of any such requisition to be disbursed from the Work Allowance, the prior

disbursements of the Work Allowance will be taken into account. For example and illustration

purposes only, if the proportion that the amount of the Work Allowance bears to the total cost of

Tenant's Initial Work as set forth in Construction Construct is 30%, and Landlord had thereto

before paid 50% of each requisition, there will an appropriate reconciliation and adjustment to

the percentage of each such requisition being funded by the Work Allowance until such

reconciliation and adjustment has been finished. Illustrating the foregoing, if the total cost of

Tenant's Initial Work set forth in the Construction Contract is $31,253,833.00 (i.e., the Work

Allowance representing 30% of said amount), and Landlord had previously disbursed

$500,000.00 of the Work Allowance to Tenant based on requisitions of $1,000,000.00 then

Tenant shall pay the next $200,000.00 in hard and soft costs of Tenant's Initial Work, and

thereafter, the Work Allowance shall be disbursed using the methodology originally prescribed

in Section 3.2 of the Lease (i.e., based on the proportion the Work Allowance bears to the total

cost of Tenant's Initial Work as set forth in Construction Construct, which in the foregoing

example was 30%). Tenant shall furnish Landlord with a Construction Contract within three (3)

business days of the full execution and delivery thereof. Tenant shall provide Landlord with bi-

weekly updates from Tenant's design team and production architect.

Section 4.3.    Notwithstanding anything to the contrary contained in Exhibit B to

the Lease, Landlord's Work shall not include providing any vertical (i.e., an elevator) from

Lower Level 1 to Ground Floor (the "**Elevator Work**"); it being understood and agreed that

same shall be the sole responsibility of Tenant. In consideration of Tenant performing the

Elevator Work, Landlord shall, subject to the terms and conditions of Section 3.2 (other than the

requirement to have a fully executed Construction Contract and Landlord funding 100% of each

8

requisition for the Elevator Work up to an not exceeding the amount of the Elevator Work

Allowance, as defined below) and Article 8 of the Lease, pay to Tenant (in addition to the Work

Allowance) an amount equal to actual cost of the Elevator Work but in no event more than Four

Hundred Thousand and 00/100 ($400,000.00) Dollars (the "**Elevator Work Allowance**"); it

being understood and agreed that all costs and expenses respecting the Elevator Work that are in

excess of the Elevator Work Allowance shall be borne solely by Tenant.

      Section 4.4.    Landlord has informed Tenant that Landlord requires an egress

passage as depicted on <u>Exhibit B</u> annexed hereto (the "**Egress Hall Passage**").  As an

accommodation, Tenant has agreed to construct the Egress Hall Passage for Landlord

contemporaneous with the performance of Tenant's Initial Work.   In consideration of Tenant

constructing the Egress Hall Passage, Landlord shall, subject to the terms and conditions of

Section 3.2 (other than the requirement to have a fully executed Construction Contract and

Landlord funding 100% of the reasonable third party out-of-pocket costs and expenses reflected

in requisitions for the Egress Hall Passage) and Article 8 of the Lease, pay to Tenant an amount

equal to the actual reasonable third party out-of-pocket costs and expenses of constructing the

Egress Hall Passage; it being understood and agreed that all actual reasonable third party out-of-

pocket costs and expenses incurred with respect to the construction of the Egress Hall Passage

shall be borne solely by Landlord.

      Section 4.5.    Tenant hereby acknowledges and agrees that as of the date hereof,

all of Landlord's Work has been substantially completed.

## ARTICLE 5

### BROKERAGE

Section 5.1.    Tenant and Landlord represent and warrant to each other that neither Tenant nor Landlord, as the case may be, consulted nor negotiated with any broker or finder with regard to this Agreement other than Newmark Grubb Knight Frank ("**Broker**"). Tenant agrees to indemnify, defend and save Landlord harmless from and against any claims for fees or commissions from anyone other than Broker with whom Tenant has dealt in connection with this Agreement.  Landlord agrees to indemnify, defend and save Tenant harmless from and against any claims for fees or commissions from anyone (including Broker) with whom Landlord has dealt in connection with this Agreement.  Landlord shall pay Broker any fee or brokerage commissions to which it may be entitled in connection with this Agreement pursuant to a separate agreement.

## ARTICLE 6

### CONFIRMATION OF CERTAIN DATES; SECURITY LETTER

Section 6.1.    Landlord and Tenant hereby confirm and agree to the following: (i) the Delivery Date shall mean December 15, 2019, (ii) the Commencement Date shall mean March 15, 2020, (iii) the Rent Commencement Date shall mean September 15, 2020 (as such date may be extended for any COVID-19 Delay (as hereinafter defined) subject to and in accordance with Article 8 hereof), and (iv) the Expiration Date shall mean September 30, 2040. Notwithstanding anything to the contrary contained in the Lease (as modified by this Agreement), the payment of fixed annual rent for the period September 15, 2020 to and including December 31, 2020 in the amount of One Million Two Hundred Twenty-Three Thousand Three Hundred Thirty-Nine and 88/100 ($1,223,339.88) Dollars shall be deferred to

10

and become fully due and payable to Landlord by December 31, 2020. Notwithstanding anything to the contrary contained in the Lease, all of Tenant's obligations thereunder shall commence as of the date of this Agreement.

Section 6.2.    In consideration of the agreement to the dates set forth in Section 6.1, Landlord and Tenant have agreed to the following:

(a)    Tenant shall not be required to utilize Landlord's alternative kitchen exhaust path extending to the 11th floor louvre band, and in lieu thereof Tenant shall be permitted to exhaust through an existing louvre at the Liberty Street street level; it being understood and agreed that the primary path shall be through the B-1 garage level where it shall intersect with Landlord's vertical spill air plenum. A depiction of such kitchen exhaust path is more particularly depicted on Exhibit C annexed hereto (the "**Approved Kitchen Exhaust Path**"). Although the utilization of the Approved Kitchen Exhaust Path is estimated to reduce the cost of Tenant's Initial Work by approximately $1,000,000.00 to $1,400,000.00, Landlord is not making any representation as to any cost savings, and if and to the extent no such cost savings are achieved, same shall be without any liability to Landlord and the dates set forth in Section 6.1 shall remain unchanged;

(b)    Tenant's obligation to fixed annual rent, Percentage Rent, Stipulated Operating Payment, Tax Payments and/or any other additional rent shall be tolled until January 1, 2021 (as such date may be extended for any COVID-19 Delay subject to and in accordance with Article 8 hereof), upon which date all such amounts which have accrued up to such date shall become due and payable to Landlord; and

(c)    Section 42.7 of the Lease is hereby modified so that the "Opening Outside Date" means April 1, 2021 as such date shall be extended for delays in completion resulting from

11

LEGAL_US_E # 145073564.12 92764.00025

Force Majeure Causes and, subject to the provisions of Section 10.5(b), an Adverse Delay Condition.

Section 6.3.    Section 48.1 of the Lease is hereby modified so that Tenant must deliver to landlord the Security Letter on or before April 30, 2020, time being of the essence.

ARTICLE 7

GAS WORK AND KITCHEN EXHAUST WORK

Section 7.1.    Notwithstanding anything to the contrary contained in the Lease but subject to the provisions hereof, Landlord shall perform such work as is necessary in order to provide direct metered gas service to the Premises (the "**Gas Work**"). Prior to and as a condition to performing the Gas Work, Landlord shall furnish Tenant with one or more estimates from contractors respecting the cost of the Gas Work ("**Gas Work Estimate**"). Landlord shall have no obligation to proceed with the Gas Work until such time as Tenant approves a Gas Work Estimate. The actual reasonable out-of-pocket costs incurred by Landlord in performing the Gas Work shall reduce the amount of the Work Allowance on a dollar for dollar basis.

Section 7.2.    Tenant may elect by notice to Landlord given prior to May 1, 2020 (the "**Kitchen Exhaust Notice**"), to have Landlord perform the fabrication and installation of the tenant's kitchen exhaust from the demising wall of the premises to the exterior louver band (the "**Kitchen Exhaust Work**"). Prior to and as a condition to performing the Kitchen Exhaust Work, Landlord shall furnish Tenant with one or more estimates from contractors respecting the cost of the Kitchen Exhaust Work ("**Kitchen Exhaust Work Estimate**"). Landlord shall have no obligation to proceed with the Kitchen Exhaust Work until such time as Tenant approves a Kitchen Exhaust Work Estimate. The actual reasonable out-of-pocket costs incurred by Landlord in performing the Kitchen Exhaust Work shall reduce the amount of the Work

12

Allowance on a dollar for dollar basis. Time shall be of the essence with respect to the timely delivery of the Kitchen Exhaust Notice by the date so herein specified.

Section 7.3.    For the avoidance of doubt, neither the Gas Work nor the Kitchen Exhaust Work shall be deemed Landlord's Work.

ARTICLE 8

COVID-19 DELAYS

Section 8.1.    Notwithstanding anything to the contrary contained in the Lease, including Article 30 thereof, if at the time Tenant is ready to commence construction of Tenant's Initial Work at the Premises and is prevented from doing so as the sole result of: (i) an executive order or other Legal Requirement that would prohibit the performance of such construction at the Premises as a result of the COVID-19 virus, and/or (ii) Landlord restricting access to the Premises as a result of the COVID-19 virus (any of the foregoing, a "**COVID-19 Delay**"), then in either such case, the Rent Commencement Date shall be extended one (1) day for each day that Tenant is prevented from commencing the performance of construction of Tenant's Initial Work at the Premises as the sole result of a COVID-19 Delay.  For purposes hereof, "**ready to commence construction of Tenant's Initial Work**" shall mean that (1) Tenant has completed a 100% construction drawings set for Tenant's Initial Work ("**100% CD**"), and has furnished a copy of the 100% CD to Landlord, (b) Tenant has issued a formal request for proposal for bids to construct Tenant's Initial Work as per the 100% CD set (an "**RFP**"), and has furnished a copy of the RFP to Landlord, (c) Tenant has received and leveled bids to construct Tenant's Initial Work as per the 100% CD, and has furnished Landlord with reasonable evidence of same, (d) Tenant has issued an award to and entered into a Construction Contract with a general contractor for Tenant's Initial Work based on the 100% CD to begin construction, and has furnished Landlord

13

with a copy of the Construction Contract, and (e) said general contractor is ready to mobilize and begin construction of Tenant's Initial Work for any COVID-19 Delay. Any dispute as to whether or not Tenant was prevented from commencing construction of Tenant's Initial Work at the Premises as the sole result of a COVID-19 Delay may be resolved by expedited arbitration in accordance with Section 46 of the Lease.

## ARTICLE 9

## MISCELLANEOUS

Section 9.1.    Except as modified, amended and supplemented by this Agreement, the Lease and all covenants, agreements, terms and conditions thereof shall continue in full force and effect and are hereby in all respects ratified and confirmed. In the event of any inconsistency between the terms of this Agreement and the terms of the Lease, the terms of this Agreement shall govern and control.

Section 9.2.    This Agreement shall not be binding upon Landlord and Tenant unless and until it is signed by both parties hereto and a signed copy thereof is delivered by Landlord to Tenant.

Section 9.3.    This Agreement constitutes the entire agreement among the parties hereto with respect to the matters stated herein and may not be amended or modified unless such amendment or modification shall be in writing and signed by each party hereto.

Section 9.4.    The terms, covenants and conditions contained in this Agreement shall bind and inure to the benefit of the parties hereto and their respective successors and assigns. Each party hereto and the persons signing below warrant that the person signing below on such party's behalf is authorized to do so and to bind such party to the terms of this Agreement.

14

Section 9.5.    This Agreement shall be governed in all respects by the laws of the State of New York.

Section 9.6.    No failure or delay by a party to insist upon the strict performance of any term, condition or covenant of this Agreement, or to exercise any right, power or remedy hereunder shall constitute a waiver of the same or any other term of this Agreement or preclude such party from enforcing or exercising the same or any such other term, conditions, covenant, right, power or remedy at any later time.

Section 9.7.    Each party agrees that upon demand, it shall promptly perform all further acts and execute, acknowledge, and deliver all further instructions, instruments and documents which may be reasonably necessary or useful to carry out the provisions of this Agreement.

Section 9.8.    This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, and together shall be deemed to be one and the same instrument.  In addition, the parties may execute separate signature pages, and such signature pages (and/or signature pages which have been detached from one or more duplicate original copies of this Agreement) may be combined and attached to one or more copies of this Agreement so that such copies shall contain the signatures of all of the parties hereto.  To facilitate execution of this Agreement, the parties hereto may exchange counterparts of this Agreement by electronic mail (e-mail) (which shall include, but not be limited to, electronic attachments in 'pdf' format containing counterparts of the signature page to this Agreement), which shall be effective as original signature pages for all purposes.

*[signature page follows]*

15

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

LANDLORD:

**SUMMIT GLORY PROPERTY LLC,**
a Delaware limited liability company

By: _____
Name: Wei Bo
Title: President

TENANT:

**LFH FOOD HALL OPERATING, LLC,**
a New York limited liability company

*Wide carry LLC-1*
By: _____
Name: *Charles A Siegel*
Title: *Managing Member*

Discernment LLC hereby confirms, acknowledges and agrees that the obligations of Discernment LLC under that certain Good Guy Guaranty dated as of December 31, 2018 (the "Guaranty") are extended to include this Agreement and all of terms and provisions contained herein, and that such Good Guy Guaranty remains in full force and effect and the legal, valid and binding obligation of Discernment LLC, enforceable in accordance with its terms.

**DISCERNMENT LLC,**
a Delaware limited liability company

By: _____
Name: Jose Ortiz
Title: Managing Member

FILED: NEW YORK COUNTY CLERK 11/10/2021 12:14 PM
INDEX NO. 656420/2021
NYSCEF DOC. NO. 3
RECEIVED NYSCEF: 11/10/2021

22-22041-shl    Doc 9    Filed 03/21/22    Entered 03/21/22 16:30:07    Main Document
Pg 34 of 57

EXHIBIT A-1

(*see Ground Floor Plan attached*)

LEGAL_US_E # 145073564.12 92764.00025

FILED: NEW YORK COUNTY CLERK 11/10/2021 12:14 PM
INDEX NO. 656420/2021
NYSCEF DOC. NO. 3
22-22041-shl   Doc 9   Filed 03/21/22   Entered 03/21/22 16:30:07   Main Document
RECEIVED NYSCEF: 11/10/2021
Pg 35 of 57



28 Liberty St

N

Ground Floor

Prepared by PlanData Systems Corp.
November 7, 2019

0 5 10   20   30   40   50   60   70

EXHIBIT A-2

*(see floor plan attached)*

A-2-1



28 Liberty St

N

Floor - 1B

Prepared by RanData Systems Corp.
November 7, 2019

0 5 10  20  30  40  50  60  70

FILED: NEW YORK COUNTY CLERK 11/10/2021 12:14 PM
NYSCEF DOC. NO. 3

INDEX NO. 656420/2021
RECEIVED NYSCEF: 11/10/2021

22-22041-shl    Doc 9    Filed 03/21/22    Entered 03/21/22 16:30:07    Main Document
Pg 38 of 57

EXHIBIT B

Egress Hall Passage

(*see attached*)

LEGAL_US_E # 145073564.12 92764.00025

FILED: NEW YORK COUNTY CLERK 11/10/2021 12:14 PM
INDEX NO. 656420/2021
NYSCEF DOC. NO. 3
22-22041-shl    Doc 9    Filed 03/21/22    Entered 03/21/22 16:30:07    Main Document
RECEIVED NYSCEF: 11/10/2021
Pg 39 of 57



28 Liberty St

Egress corridor to be
constructed by tenant
at landlord's expense

N

Ground Floor

Prepared by PlanData Systems Corp.
February 21, 2020

0 5 10   20   30   40   50   60  70

FILED: NEW YORK COUNTY CLERK 11/10/2021 12:14 PM
INDEX NO. 656420/2021
NYSCEF DOC. NO. 3
RECEIVED NYSCEF: 11/10/2021

22-22041-shl    Doc 9    Filed 03/21/22    Entered 03/21/22 16:30:07    Main Document
Pg 40 of 57

EXHIBIT C

Approved Kitchen Exhaust Path

*(see attached)*

LEGAL_US_E # 145073564.I2 92764.00025

FILED: NEW YORK COUNTY CLERK 11/10/2021 12:14 PM
INDEX NO. 656420/2021
NYSCEF DOC. NO. 3
RECEIVED NYSCEF: 11/10/2021
22-22041-shl    Doc 9    Filed 03/21/22    Entered 03/21/22 16:30:07    Main Document
Pg 41 of 57

MATCH LINE AA

22-22041-shl    Doc 9    Filed 03/21/22    Entered 03/21/22 16:30:07    Main Document
Pg 42 of 57

MATCH LINE AA

N.I.C

EXHIBIT "3"

THIS SECOND AMENDMENT OF LEASE (this "**Agreement**") dated June__,

2021 between **SUMMIT GLORY PROPERTY LLC**, a Delaware limited liability company

with offices at 28 Liberty Street, New York, New York 10005 (hereinafter called "**Landlord**")

and **LFH FOOD HALL OPERATING, LLC**, a New York limited liability, having an office at

1133 Westchester Avenue, S-221, White Plains, New York 10604 (herein called "**Tenant**").

W̲ I̲ T̲ N̲ E̲ S̲ S̲ E̲ T̲ H̲:

WHEREAS, pursuant to that certain Agreement of Lease dated as of December

31, 2018 (as amended by that certain First Amendment of Lease dated March 31, 2020 (the

"**First Amendment**"), collectively, the "**Lease**") between Landlord and Tenant, Landlord leased

to Tenant and Tenant leased from Landlord certain premises located on the ground floor and

lower level 1 in the building known as 28 Liberty Street, New York, New York (hereinafter

called the "**Building**").  Such premises as more particularly described in the Lease are herein

referred to as the "**demised premises**";

WHEREAS, Tenant has defaulted in the payment of fixed annual rent and various

components of additional rent under the Lease and has requested that Landlord restructure the

Lease to provide for a deferral of the payment of such past due rent and future rent; and

WHEREAS, Landlord and Tenant agree to amend and modify the Lease to

provide for (i) the deferral of certain payments of fixed annual rent and additional rent in

accordance with the terms of this Agreement, and (ii) to otherwise amend and modify the Lease

certain other respects, all as more particularly set forth in this Agreement.

NOW, THEREFORE, in consideration of the agreements herein contained and

other good and valuable consideration, receipt of which is hereby acknowledged, the parties

hereto agree as follows:

# ARTICLE 1

## TERMS

Section 1.1.    Except as otherwise defined herein, all terms used in this

Agreement shall have the meanings provided in the Lease.  The phrases "**this Lease**" or "**the**

**Lease**" as used in the Lease shall mean the Lease as amended and modified pursuant to this

Agreement and as the same may be amended, modified and extended from time to time.  All

capitalized terms not otherwise defined in this Agreement shall have the meaning ascribed to

such term in the Lease.

# ARTICLE 2

## OUTSTANING RENT

Section 2.1.    As more particularly set forth in Schedule 1 annexed hereto, for the

period commencing on September 15, 2020 and ending on _____ __, 2021(the

"**Current Date**"), Tenant failed to pay fixed annual rent and various components of additional

rent in the aggregate amount of $_____ (the "**Current Outstanding Rent**").  The

Current Outstanding Rent together with all other unpaid fixed annual rent and additional rent

with respect to the period commencing on the day immediately following the Current Date to

and including the date immediately preceding the commencement of the Repayment Period (as

hereinafter defined) is collectively herein referred to as the "**Outstanding Rent**."  As more

particularly set forth in Section 3.3 below, the Outstanding Rent shall become due and payable

by Tenant commencing on the first day of the Repayment Period in thirty-six (36) consecutive

equal monthly installments as part of fixed annual rent.  All Outstanding Rent shall bear interest

at the rate of five percent (5%) per annum accruing from the date the subject amounts first

became due and payable until paid.

2

NYSCEF DOC. NO. 36

# ARTICLE 3

## ALTERNATIVE PERCENTAGE RENT; PAYMENT OF OUTSTANDING RENT

Section 3.1.          For the period commencing on July 1, 2022, and ending on December 31, 2022 (the "**Alternative Rent Period**"), in lieu of monthly fixed annual rent payments, Tenant pay Landlord an amount equal to eighteen percent (18%) of Net Gross Sales (the "**Alternative Percentage Rent**").   Installments of Alternative Percentage Rent shall be due and payable monthly, in arrears, within ten (10) days after the last day of each month during the Alternative Rent Period and the month immediately following end of the Alternative Rent Period.  The respective rights and obligations of Landlord and Tenant with respect to Alternative Percentage Rent as pertaining to recording keeping and audits rights shall be the same as are applicable to Percentage Rent.  The total amount of Alternative Percentage Rent actually paid by Tenant to Landlord with respect to the Alternative Rent Period shall hereinafter referred to as the "**Alternative Percentage Rent Payment Amount**".

(a)      If the aggregate Alternative Percentage Rent Payment Amount is less than $2,096,962.50 (i.e., the total amount of fixed annual rent that would have otherwise been payable during the Alternative Rent Period), then the amount of such shortfall shall be added to the Outstanding Rent payable by Tenant pursuant to Section 2.1.

(b)      Following the expiration of the Alternative Rent Period the fixed annual rent shall revert back to the amounts first set forth in the Lease.

Section 3.2.    Notwithstanding anything to the contrary contained in the Lease, during the Alternative Rent Period, in addition to the Alternative Percentage Rent, Tenant shall continue to remain obligated for the payment of all other items of additional rent payable under the Lease, including, without limitation, Tax Payments and Tenant's Operating Payments.

3

FILED: NEW YORK COUNTY CLERK 03/08/2022 06:58 PM
INDEX NO. 656420/2021
NYSCEF DOC. NO. 36
RECEIVED NYSCEF: 03/08/2022

22-22041-shl    Doc 9    Filed 03/21/22    Entered 03/21/22 16:30:07    Main Document
Pg 48 of 57

Section 3.3.    For the period commencing on the date that is the earlier to occur of (i) May 15, 2023, and (ii) the date that Tenant first opens for business to the general public at the demised premises, and ending on day immediately preceding the third (3rd) anniversary thereof (the "**Repayment Period**"), the fixed annual rent payable by Tenant shall be increased by the amount by the amount of Outstanding Rent.  Following the expiration of the Repayment Period and payment in full of the Outstanding Rent, the fixed annual rent shall revert back to the amounts first set forth in the Original Lease.

Section 3.1.    Notwithstanding anything to the contrary contained herein, Tenant acknowledges and agrees in the event of a monetary default by Tenant after applicable notice and cure period, then all Outstanding Rent shall be accelerated so that same shall become immediately due and payable by Tenant to Landlord without further notice, and Landlord shall have the same rights and remedies for Tenant's failure to make timely payments as Landlord has with respect to the non-payment and/or late payment of monthly fixed annual rent which was not previously deferred under the Lease.

ARTICLE 4

WORK ALLOWANCE

Section 4.1.    From and after the date hereof, disbursements of the balance of the Work Allowance shall be made in accordance with Section 3.2 of the Lease as unmodified by Section 4.2 of the First Amendment; provided that for the purpose of determining the pro rata portion of any such requisition to be disbursed from the Work Allowance, the prior disbursements of the Work Allowance will be taken into account.  For example and illustration purposes only, if the proportion that the amount of the Work Allowance bears to the total cost of Tenant's Initial Work as set forth in Construction Construct is 30%, and Landlord had thereto

4

before paid 50% of each requisition, there will an appropriate reconciliation and adjustment to the percentage of each such requisition being funded by the Work Allowance until such reconciliation and adjustment has been finished.

## ARTICLE 5

## CRITCAL DATES

Section 5.1.    On or prior to October 1, 2021 (time being of the essence), Tenant shall enter into a Construction Contract and furnish Landlord with a copy of same.  On or prior to November 1, 2021 (time being of the essence), Tenant shall secure required permits from the New York City Department of Buildings for the performance of Tenant's Initial Work.

Section 5.2.    Contemporaneous with Tenant's execution and delivery of this Agreement, Tenant shall furnish the Landlord with the Security Letter meeting all the requirements set forth in Article 48 of the Lease.

Section 5.3.    Landlord and Tenant hereby confirm and agree that the Outside Opening Date shall be July 1, 2022 (the "**Revised Outside Opening Date**").  Notwithstanding anything to the contrary contained herein, in addition to any rights and remedies available to Landlord as set forth in the Lease, if Tenant fails to open for business to the general public at the Premises by the Revised Outside Opening Date, then all fixed annual rent and additional rent that has accrued though the Revised Outside Opening Date, including the Outstanding Rent, shall become immediately due and payable by Tenant to Landlord.

## ARTICLE 6

## MISCELLANEOUS

Section 6.1.    If the Lease is terminated as a result of any Tenant default thereunder, then in addition to any rights and remedies available to Landlord, all design and development documents, drawings and plans related to the Premises prepared on behalf of Tenant shall become the sole property of Landlord, and Tenant shall furnish Landlord with copies of same.

Section 6.2.    Except as modified, amended and supplemented by this Agreement, the Lease and all covenants, agreements, terms and conditions thereof shall continue in full force and effect and are hereby in all respects ratified and confirmed.  In the event of any inconsistency between the terms of this Agreement and the terms of the Lease, the terms of this Agreement shall govern and control.

Section 6.3.    This Agreement shall not be binding upon Landlord and Tenant unless and until it is signed by both parties hereto and a signed copy thereof is delivered by Landlord to Tenant.

Section 6.4.    This Agreement constitutes the entire agreement among the parties hereto with respect to the matters stated herein and may not be amended or modified unless such amendment or modification shall be in writing and signed by each party hereto.

Section 6.5.    The terms, covenants and conditions contained in this Agreement shall bind and inure to the benefit of the parties hereto and their respective successors and assigns.  Each party hereto and the persons signing below warrant that the person signing below on such party's behalf is authorized to do so and to bind such party to the terms of this Agreement.

Section 6.6.    This Agreement shall be governed in all respects by the laws of the State of New York.

FILED: NEW YORK COUNTY CLERK 03/08/2022 06:58 PM          INDEX NO. 656420/2021
NYSCEF DOC. NO. 36    22-22041-shl   Doc 9   Filed 03/21/22   Entered 03/21/22 16:30:07   Main Document   RECEIVED NYSCEF: 03/08/2022

Pg 51 of 57

Section 6.7.    No failure or delay by a party to insist upon the strict performance of any term, condition or covenant of this Agreement, or to exercise any right, power or remedy hereunder shall constitute a waiver of the same or any other term of this Agreement or preclude such party from enforcing or exercising the same or any such other term, conditions, covenant, right, power or remedy at any later time.

Section 6.8.    Each party agrees that upon demand, it shall promptly perform all further acts and execute, acknowledge, and deliver all further instructions, instruments and documents which may be reasonably necessary or useful to carry out the provisions of this Agreement.

Section 6.9.    This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, and together shall be deemed to be one and the same instrument.  In addition, the parties may execute separate signature pages, and such signature pages (and/or signature pages which have been detached from one or more duplicate original copies of this Agreement) may be combined and attached to one or more copies of this Agreement so that such copies shall contain the signatures of all of the parties hereto.  To facilitate execution of this Agreement, the parties hereto may exchange counterparts of this Agreement by electronic mail (e-mail) (which shall include, but not be limited to, electronic attachments in 'pdf' format containing counterparts of the signature page to this Agreement), which shall be effective as original signature pages for all purposes.

[*signature page follows*]

7

IN WITNESS WHEREOF, the parties hereto have executed this

Agreement as of the day and year first above written.

LANDLORD:

**SUMMIT GLORY PROPERTY LLC**,
a Delaware limited liability company

By: _____
Name:   Wei Bo
Title:    President

TENANT:

**LFH FOOD HALL OPERATING, LLC,**
a New York limited liability company

By: _____
Name:
Title:

Discernment LLC hereby confirms, acknowledges and agrees that the obligations of Discernment LLC under that certain Good Guy Guaranty dated as of December 31, 2018 (the "Guaranty") are extended to include this Agreement and all of terms and provisions contained herein, and that such Good Guy Guaranty remains in full force and effect and the legal, valid and binding obligation of Discernment LLC, enforceable in accordance with its terms.

**DISCERNMENT LLC**,
a Delaware limited liability company

By: _____
Name:

FILED: NEW YORK COUNTY CLERK 03/08/2022 06:58 PM INDEX NO. 656420/2021

NYSCEF DOC. NO. 30 RECEIVED NYSCEF: 03/08/2022

Title:

LEGAL_US_E # 155790273.1 92764.00025

EXHIBIT "4"

From: **Tom Costanzo** tcostanzo@fosun.com

Subject: **RE: proposed amendment to LFH lease**

Date: April 16, 2021 at 5:04:05 PM

To: **Bob Towers** bobtowers@me.com

Cc: **Jason Berkeley** jasonberkeley@fosun.com, **Isabella 陈思伊** isabella.chen@fosun.com

---

Bob,

A couple of quick observations:

1   We have always agreed to the concept of delaying rent until opening, but the current rent was to be deferred and paid back in the future.  Elimination of the obligation outright was never contemplated.

2   I don't know how you would charge percentage rent on a portion of the space.

3   A reduction in the base rent at stabilization again has never been considered.

I would ask that you review these points again and consider revising your proposal as this will not be received well in NY or Shanghai.

TC

---

**From:** Robert Towers [mailto:bobtowers@me.com]

**Sent:** Friday, April 16, 2021 4:19 PM

**To:** Tom Costanzo

**Subject:** proposed amendment to LFH lease

April 16, 2021

FILED: NEW YORK COUNTY CLERK 03/08/2022 06:58 PM
INDEX NO. 656420/2021
NYSCEF DOC. NO. 37
RECEIVED NYSCEF: 03/08/2022

22-22041-shl    Doc 9    Filed 03/21/22    Entered 03/21/22 16:30:07    Main Document
Pg 56 of 57

Thomas J. Costanzo

Executive President

Fosun Hive Holdings


Dear Tom:


Thank you again for your kind words concerning the passing of my wife.


So that we don't waste time and money I wanted to let you know some of the points that we believe need to be addressed by our lawyers in a proposed amendment to our lease.


Most important rent does not begin until we open the food hall, any previous rent indicated as due in the original lease or the first amendment to the lease is to be eliminated.


When the food hall opens the rent is to be on a percentage basis based on sales and factoring in building and area occupancy.


We believe the front space, which is an accommodation to the building, we do not really need it,  should continue as percentage rent for the life of the lease.


When we reach what we all agree is a new normal the base rent should be reduced to $95 PSF.

FILED: NEW YORK COUNTY CLERK 03/08/2022 06:58 PM    INDEX NO. 656420/2021
NYSCEF DOC. NO. 37                                 RECEIVED NYSCEF: 03/08/2022

It is our understanding, aside from the letter from William Vasquez, that the final two plans that Jason requires are the makeup air plan and the egress plan.  The egress plan is done by us but paid for by Fosun  according to the first amendment.

We want to get going and sign on with a GC, ( we have about ten bids), you may be aware that all costs have gone up dramatically.  Our biggest concern is stainless steel which, besides being hard to get it is up some 25-30%, this is most dramatic concerning the kitchen.

We need to know how long it will take Jason to approve the plans.  At that point we will sign the GC contract and begin construction, however because of the pandemic we now need more then the original 9 months for construction, perhaps 12-15 months is safe.

There will probably be some back and forth so before we start with the lawyers I thought this was a quicker way to get things moving.

Thank you and be well,

Bob Towers