| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>SOUTHERN DISTRICT OF NEW YORK | NOT FOR PUBLICATION |

-------------------------------------------------------------x

| | |
|---|---|
| In re: | Chapter 7 |
| LFH Food Hall Operating, LLC | Case No. 22-22041 (SHL) |
| Debtor. | |

-------------------------------------------------------------x

## MODIFIED BENCH DECISION GRANTING THE INVOLUNTARY DEBTOR'S MOTION TO DISMISS THE INVOLUNTARY PETITION[1]

**A P P E A R A N C E S:**

**Paul Hastings LLP**
*Counsel for Petitioning Creditor, Summit Glory Properties, LLC*
200 Park Avenue
New York, NY 10166
By:    Harvey A. Strickon, Esq.

**Davidoff Hutcher & Citron LLP**
*Counsel for Involuntary Debtor, LFH Food Hall Operating, LLC*
605 Third Avenue
New York, NY 10158
By: James B. Glucksman, Esq., Robert Leslie Rattet, Esq.

**SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court is the motion of the involuntary debtor, LFH Food Hall Operating, LLC (the "Debtor" or "LFH"), to dismiss its involuntary petition. *See* ECF No. 9.  The Petitioning Creditor is Summit Glory Properties, LLC ("Summit Glory"), which has objected to the Debtor's

---

[1]    This modified bench decision is derived from the Court's oral bench ruling dated August 8, 2022. *See Transcript of August 8, 2022, Hr'g* [ECF No. 22].   At the August 8, 2022, hearing, after the Court read its decision into the record, the Court asked the parties to let the Court know if there was an intent to appeal so that the Court could review the hearing transcript and clean it up as necessary.  On September 8, 2022, Summit Glory Properties, LLC informed the Court that it had filed an appeal on September 2, 2022.  *See also* Notice of Appeal [ECF No. 24]. Accordingly, the Court has turned the oral bench ruling into this modified bench decision; the substance of this decision is the same as the oral bench ruling, but it has been edited for clarity and readability.  Given its origin as a bench ruling, this decision occasionally strikes a more conversational tone than the Court's other more formal written opinions.

1

motion.  *See* ECF No. 15.  The Debtor filed a reply.  *See* ECF No. 18.  There was a letter that came after the reply dated June 29th.  *See* ECF No. 20.  That was in the nature of a sur reply, which is impermissible without first obtaining permission of the Court.  *See Horner v. O'Rourke Commercial Corp.*, 2021, U.S. District Lexis 64026 at *4 (S.D.N.Y. Mar. 31, 2021).

Let me lay out some of the facts here.  Summit Glory, the sole petitioning creditor, filed the involuntary petition.  At the time of the commencement of the involuntary case, Summit Glory had a pending state court civil action against LFH pending in the New York City civil court, non-housing Part 52, Case Number LT-300566-22/NY.  *See* Notice of Removal of the State Court Civil Action to the Bankruptcy Court ¶ 2 [ECF No. 3].  On February 4, 2022, the state court action was removed to this Court.  *Id.*

LFH and Summit Glory had entered into a lease agreement in December of 2018 with LFH intending to construct and operate a food hall at 28 Liberty Street, New York, New York.  *See* Declaration of Robert Towers in Support of Motion Seeking Dismissal of Involuntary Chapter 7 Petition.  ECF No. 9 ¶ 6 ("Towers Decl. #1"); *see also* Declaration of Tom Costanza in Support of the Objection to Debtor's Motion to Dismiss, ECF No. 15-1 ¶ 3 ("Costanza Decl.").

The lease was amended for the first time in late March 2020.  *See* Towers Decl. #1 ¶ 9; Costanza Decl. ¶ 4.  Both parties allege that the other party breached the amended lease.  On the one hand, Summit Glory alleges LFH failed to pay any of the amounts due for fixed annual or additional rent between the rent commencement date of September 15, 2020 and August 1, 2021.  *See* Costanza Decl. ¶¶ 5, 8. On the other hand, LFH proffers that Summit Glory did not hold up its obligations to fund construction of the food hall or provide necessary access to the builders.  *See* Towers Decl. #1 ¶¶ 11-14.

2

LFH also argues that an email sent by Mr. Costanza in April 2020 evidences an intent to allow the Debtor to delay payment of rent until the food hall opened.  *See* Towers Decl. #1 ¶ 23; *see also* Exh. 4.  The initial email on the subject was from Mr. Towers to Mr. Costanza and was sent April 19, 2021, with the subject "Proposed Amendment to Lease."  *See* Towers Decl. #1 Exh. 4.  In the body of the email, he refers to points that LFH needed to be addressed by their lawyers in the most recent amendment to the lease, which included their belief that rent does not begin until LFH opens the food hall.  *See* Towers Decl. #1 Exh. 4.  Moreover, it was LFH's belief that any previous rent due in the original or first amended lease was to be eliminated.  *See id.*  The email also contemplated that when the food hall opens, the rent was to be on a percentage basis based on sales and factoring in occupancy.  *Id.*  In a response sent later that date, Mr. Costanza replied, "We've always agreed to the concept of delaying rent until opening, but the current rent was to be deferred and paid back in the future." *Id*.  "Elimination of the obligation outright was never contemplated.  And I don't know how you would charge percentage rent on a portion of the space." *Id.*

Summit Glory argues that LFH defaulted in August of 2021, and that Summit Glory sent a notice of default in September 2021 and sent two notices of cure, in November and in December of that year.  *See* Costanza Decl. ¶¶ 11-13.  Then in December 2021, Summit Glory sent a termination notice, which advised LFH that the lease would be terminated effective the end of the year.  And shortly after that, Summit Glory filed the state court action seeking the warrant of eviction.

The requirements for an involuntary petition case are set forth in Section 303(b) of the Bankruptcy Code.  Section 303 governs the requirements for filing an involuntary bankruptcy case such as this one, and it provides in relevant part, that:

3

> An involuntary case . . . is commenced by the filing with the bankruptcy court of a petition under chapter 7 or 11 of this title:
>
> (1) by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount, or an indenture trustee representing such a holder, if such noncontingent, undisputed claims aggregate at least $15,775 more than the value of any lien on property of the debtor securing such claims held by the holders of such claims;
>
> (2) if there are fewer than 12 such holders, excluding any employee or insider of such person and any transferee of a transfer that is voidable under section 544, 545, 547, 548, 549, or 724(a) of this title, by one or more of such holders that hold in the aggregate at least $15,775 of such claims. . . .

11 U.S.C. § 303(b).

The Debtor contends that the Petitioning Creditor here has not satisfied the requirements of having enough creditors. When assessing the requirements of Section 303(b), the involuntary debtor bears the initial burden of showing it has 12 or more creditors. *See In re European American Lodging Corp.*, 357 B.R. 700, 714 (Bankr. S.D.N.Y. 2007). If the involuntary debtor comes forward with a list of more than 12 creditors under Rule 1003(b), the Court is to afford those creditors a reasonable opportunity to join the petition. *See* Fed. R. Bankr. P. 1003(b). Once the involuntary debtor has filed its list, the petitioning creditor would then bear the burden of showing the debtor has less than 12 creditors to the extent the creditor is relying on Subsection 303(b)(2). *See In re Euro-American Lodging Corp.*, 357 B.R. at 714 (citing *Atlas Mach. & Iron Works, Inc. v. Bethlehem Steel Corp.*, 986 F.2d 709, 715 (4th Cir. 1993)).

Applying these principles here, the Court concludes that the requirements of Section 303(b) have not been met for several reasons. The first reason is the number of creditors. In this case, the Debtor has satisfied its initial burden of having identified 12 or more creditors and thus requiring that the involuntary petition be filed by at least three creditors. Annexed to the original motion is a list of 17 creditors, which includes addresses and contact information for each

4

creditor. *See* ECF No. 9, Exh. 1. These include 12 individuals owed for design development costs and five creditors owed for construction costs. Annexed to the Debtor's Reply is an amended schedule of some 20 creditors. *See* Declaration of Robert Towers in Support of Debtor's Response, Attachment A [ECF No. 18] ("Towers Decl. #2"). This list includes three additional individuals from the original list paid for design development and soft costs.

With the burden shifting to the petitioning creditor, Summit Glory, the Court concludes that Summit Glory has not satisfied its burden. Summit Glory argues that despite the list that LFH provides, LFH has less than 12 creditors, and this, Summit Glory can file as the sole petitioning creditor. First, Summit argues that G Builders is not a creditor because it entered into a contract with an entity other than the Debtor, specifically the entity Forthright, who owns the Debtor. *See* Costanza Decl. ¶ 39. It also argues that G Builders is an insider by virtue of its principal being an investor of the Debtor. *See* Objection ¶ 4. LFH disputes this and submits in support of its position the declaration of G Builder's managing director, saying neither he nor G Builders holds any equity interest in the Debtor. *See* Declaration of George Figliolia in Support of Debtor's Response [ECF No. 18, Attachment 2]. LFH's also annexes a form agreement entered into between LFH and G Builders to support its assertion that it is not directly related to G Builders. *See* Standard Form of Agreement between Owner and Contractor [ECF No. 18, Exhibit 1].

Summit Glory also argues that the Debtor's architect, Gensler and Associate Architects, is a subcontractor of the owner's representative rather than a creditor of the Debtor. *See* Objection ¶ 3. Summit Glory goes on to argue that it is possible that some—if not all—of the Debtor's other creditors are subcontractors of the Debtor's general contractor and therefore not creditors of the Debtor. *See* Objection ¶ 5.

5

In this dispute, the Court needs to do several things. One, it needs to look at the number of creditors, using the shifting burden standard. And so, first, it must determine whether Summit Glory is correct that subcontractors are not creditors of the Debtor. And then second, to determine what import this has in terms of the number of creditors listed by LFH.

It is important in assessing these issues to understand that it is well established that creditors of creditors do not have standing to participate in a bankruptcy case. Said another way, a creditor of a creditor is not a creditor. *See In re Comcoach Corp.*, 698 F.2d, 571, 574 (2d Cir. 1983). LFH argues that any subcontractors here are creditors by virtue of their ability to file mechanic's liens, their status as beneficiaries of Article 3A Trusts, and the fact that under Section 102(2), claims against the debtor and include claims against property of the debtor. *See* Reply ¶ 28.

It is not clear to the Court if any subcontractor here has filed a mechanic's lien. Instead, LFH's argument seems to be that the right to file a mechanic's lien would give rise to the status as a creditor. But that doesn't appear consistent with New York Lien Law. In New York, a mechanic's lien arises from the time of filing a notice of such lien. Besides the filing, a party must submit proper notice to the debtor. *See In re BH S&B Holdings LLC*, 401 B.R. 96,101 (Bankr. S.D.N.Y. 2009) (quoting N.Y. Lien Law § 3). This means that the filing of a notice is the act which creates the lien, and there's no such lien prior to filing. *See id.* Based on the record before the Court, no alleged contractor filed a lien or sent such a notice. And the Court can't identify—and the parties did not cite a case—that directly addresses the issue of whether an alleged subcontractor is a creditor simply because they can file a mechanic's lien.

In fact, the cases are split as to whether or not filing a mechanic's lien would meet the requirements of being a creditor under Section 303(b) and by extension, Section 102(2). You

6

can compare *In re East-West Associates*, 106 B.R. 767, 771 (S.D.N.Y. 1989) which held that a party meets the requirements under Section 303 through a mechanic's lien because they hold the claim against such a person, with *In re Taberna Preferred Funding IV, Ltd.*, 594 B.R. 576, 594 (Bankr. S.D.N.Y. 2018) which held that such parties do not meet the requirements of Section 303 because claims against such a debtor does not include a claim against the property of the debtor.

There is a discussion on these issues most recently in *In re Park Place Development*. *In re Park Place Development* was a single-asset real estate case consisting of a partially constructed building. *See* 2021 Bankr. LEXIS 3017, at *4 (Bankr. D. Del. Nov. 2, 2021). In that case, the petitioning creditors filed an involuntary petition against the debtor. The petitioning creditors argued that claims against "property," such as mechanic's liens, constituted claims against "such persons," as that phrase is used in Section 303(b). *Id.* at *17. The court rejected the *East-West* decision and followed *Taberna*. It held that the phrase "claims against such a person" does not include claims against a person's property. Thus, the court found that solely holding a mechanic's lien did not satisfy the criteria of 303(b). So there is a concern under the applicable law that a subcontractor would not be sufficient as a creditor under Section 303(b), even if holding a mechanic's lien.

I wanted to address the arguments about the significance of the mechanic's lien because they were discussed by the parties. But ultimately, I don't think I need to get there. I think that it doesn't matter because of the math of who's listed and who's not. When you look at the papers, Summit Glory doesn't identify which parties beyond Gensler Architects and Associates it believes to be subcontractors. And other than Gensler, the only other entity that it specifically challenges on Debtor's initial list of 17 is the G Builders entity, which it says again, is an insider.

7

But if you take those two entities out of the list of 17 creditors initially listed by the Debtor, you still end up with more than 12 creditors. That is what the evidence submitted by the parties shows. Given that record, I don't think Summit Glory has met its burden to rebut the list provided by the Debtor.

I note that the Court has conducted its own review. My own review seems to confirm this result. If you look at Black's Law Dictionary (11th ed. 2019) defining a subcontractor, it talks about someone who's awarded a portion of the existing contract by a contractor, especially a general contractor, and it cites various examples.

If you review the second list of 20 creditors that is annexed to Towers Decl. #2, the Court has identified various parties as potential subcontractors. These include: (1) Howell Belanger Castelli Architects, PC, (2) Gensler and Associates Architects, who we've already talked about, (3) MG Engineering, PC, (4) A&M Warsaw Plumbing and Heating, (5) Hydro Air Mechanical LLC and (6) last but not least, Legends. *See* Towers Decl. # 2, Exh. A at 38 of 42. So, if you subtract these six from the list of 20, and then also subtract G Builders, you also still end up with more than 12 creditors. Now it is not the Court's obligation to conduct such an independent review and to go out and find its own evidence and make its own arguments. The only thing that was presented to me in the Objection were two specific names and the possibility that there are other subcontractors. But in the interest of trying to be as thorough as possible, I did take a look at the complete list.

Moving onto the other requirements of Section 303(b), there's a second reason why this petition doesn't satisfy 303(b). And that deals with the bona fide dispute requirement. Courts apply an objective test as to whether a bona fide dispute exists. The Court must determine if there's an objective basis for either a factual or a legal dispute as to the validity of the debt. *See*

*Crest One SpA v. TPG Troy,* LLC, 793 F.3d 228, 234 (2d Cir 2015). The cases tell us there's a bona fide dispute if either a genuine issue of material fact exists or a contention of merit as to how the law applies to undisputed facts. Notably, the Court is not there to resolve the dispute, only to determine if one exists. Some factors that the Courts consider in determining whether a bona fide dispute exists is whether there's pending litigation, or whether the involuntary debtor vigorously disputes the factual underpinnings of the creditor's claim. *See Tate v. Navient Solutions, LLC*, 2022 U.S. Dist. LEXIS 52583 (S.D.N.Y. Mar. 23, 2022). For example, in the *Manolo Blahnik* case, the Court found a bona fide dispute existed when the involuntary debtor asserted a counterclaim for tortious interference, which related directly to the unpaid invoice owed to the petitioning creditor. *See In re Manolo Blahnik USA, Ltd.*, 619 B.R. 81, 94-95 (Bankr. S.D.N.Y. 2020).

The Court concludes that there is a bona fide dispute here. The email correspondence between the parties in April of 2021, at a minimum, states that rental payments would be deferred until the food hall opened, and it is undisputed that it has not opened. LFH argues that Summit Glory has breached the lease in numerous ways. It's important to note then, in making this assessment, the Court is not making any comment on the merits of the parties' contentions, but simply examining the issues as the parties have framed them, to determine whether there is a bona fide dispute.

In reaching this conclusion, I don't rely on the Debtor's argument based in the COVID-19 pandemic (arguing that its lease obligations should be excused in light of the pandemic). The Debtor argues that virtually any lease transaction that was pending before or during the pandemic has been modified because operations were legally impossible or seriously constricted. Towers Decl. # 1 ¶ 32. But in fact, the impossibility doctrine has been fairly narrowly construed when

9

applied to the COVID-19 pandemic. *See Umnv 205-207 Newbury, LLC v. Caffé Nero Ams., Inc.*, 2021 Mass. Super. LEXIS 12, at *17 (Mass. Super. Ct. Feb. 8, 2021). Many courts in New York have flatly declined to apply the doctrine to the pandemic. *See, e.g.*, *NTS W. USA Corp. v 605 Fifth Prop. Owner, LLC*, 2021 U.S. Dist. LEXIS 171240, at *16–17 (S.D.N.Y. Sep. 9, 2021) (affirming the bankruptcy court's holding that the frustration of purpose doctrine did not apply when the pandemic only reduced, but did not completely eliminate, the retail tenant's ability to generate revenue); *see also, e.g.*, *Gap, Inc. v. 170 Broadway Retail Owner*, 151 N.Y.S.3d 37 (App. Div. 1st Dep't June 2021).

Those are my conclusions as to Section 303(b). In addition to these issues about satisfying Section 303(b), the Court concludes that dismissal is appropriate on other grounds. These include Section 707 of the Bankruptcy Code, which provides that a court may dismiss a case for cause. While Section 707(a) enumerates certain circumstances which merit dismissal, this list is not exhaustive, and the Court may dismiss it for other reasons. *See In re Murray*, 543 B.R. 484, 492 (Bankr. S.D.N.Y. 2016), *aff'd*, 565 B.R. 527 (S.D.N.Y. 2017), *aff'd*, 900 F.3d 53, 58 (2d Cir. 2018).

In this Circuit, courts consider several factors to determine if cause exists to dismiss the case and to look at whether the case is an improper, duplicative use of the bankruptcy system. These include, as follows:

(1) the bankruptcy court was the most recent battlefield in a long-running two-party dispute;

(2) the judgment creditor brought the case solely to enforce the judgment;

(3) there are no competing creditors;

(4) there's no need for a pari passu distribution;

(5) assuming there were fraudulent transfers to be avoided, the judgment creditor can do so in another forum;

(6) the judgment creditor had adequate remedies to enforce a judgment under non-bankruptcy law;

(7) the judgment creditor invoked the bankruptcy laws to secure the benefits that it did not have under non-Bankruptcy Law without a Creditor community to protect;

(8) no assets would be lost or dissipated in the event the bankruptcy case did not continue; and

(9) the alleged Debtor did not need a bankruptcy discharge.

*In re Korean Radio Broad., Inc.*, 2020 Bankr. LEXIS 1170 at *18 (Bankr. E.D.N.Y. Mar. 31, 2020) (citing *In re Murray,* 900 F.3d at 57) (the "*Murray* factors").

Applying those factors here, dismissal is appropriate. Considering the first factor, whether the Bankruptcy Court was the most recent battlefield in a long-running two-party dispute, that appears to be the case. There is only one petitioning creditor, Summit Glory, who is currently and already engaged in state court litigation with LFH. Summit Glory's single aim is to remove LFH from the premises, which is not something they're competing with any other creditors about. This conclusion is echoed by statements that were made by Summit Glory's counsel, who confirmed the desire to be in bankruptcy court essentially is because it is a more efficient forum for it to protect and prosecute its rights in this two-party dispute, given the delay in state court. At the May 4, 2022 hearing, counsel said the following:

> [I]t's no secret that sending this case back to state court is a death knell because the fact that State Courts are so backed up now, that it may be in my estimation and we could be fighting this thing for the next two years in State Court, whereas if it goes into bankruptcy proceeding, the Debtor has 60 days from entry of an order of relief to decide whether to assume or reject the lease.

11

Considering other factors such as the sixth factor, whether the judgment creditor has adequate remedies to enforce its judgment under non-bankruptcy law, it clearly does in state court. The landlord-tenant court is in fact a specialized tribunal to deal with these types of matters. Looking at the seventh factor, whether or not the judgment creditor invoked the bankruptcy law to secure a benefit it didn't have under non-bankruptcy law, there certainly is a suggestion that the assumption or rejection issue would be teed up more quickly here. But that doesn't change the nature of the underlying two-party dispute with Summit Glory as the only petitioning creditor who's hoping to get the Debtor out of the premises. In considering the eighth factor, whether assets would be lost or dissipated, Summit Glory by its own admission stated at the hearing on the motion that there's no active business and it's just their hope to liquidate LFH. So, in considering the ninth factor, whether the alleged Debtor needs a bankruptcy discharge, this doesn't appear to be the case. In fact, LFH states that it intends to obtain investors and operate, rather than liquidate. *See* Towers Decl. #1 ¶ 41.

For the same reasons, even if dismissal were inappropriate for failure to comply with Section 303(b) or for cause under Section 707, abstention under Section 305 would seem to fit. Section 305 permits courts to dismiss or suspend proceedings in a case when the interest of creditors and debtors would be better served by dismissal. And granting an abstention motion requires more than just a balancing of the harms to the debtor and the creditors. The decision to dismiss must serve the debtor's and creditors' interests. Courts typically consider the following factors to determine this:

(1) the economy and efficiency of administration;

(2) whether another form is available to protect the rights and interests of both parties;

(3) whether there is already a pending proceeding in state court;

12

 (4) whether federal proceedings are necessary to reach a just and equitable resolution;

 (5) whether there's an alternative means in achieving an equitable distribution of assets;

 (6) whether the Debtors and Creditors are able to work out a less expensive, out of court arrangement;

 (7) whether a non-federal insolvency has proceeded so far that it would be costly and time consuming to start afresh with federal bankruptcy; and

 (8) the purpose to which the bankruptcy jurisdiction has been sought.

*In re Newbury Operating LLC*, 2021 Bankr. LEXIS 773, at *37 (Bankr. S.D.N.Y. Mar. 25, 2021).

When it comes to involuntary bankruptcy petitions, the statutory language and legislative history demonstrate that Congress wanted to prevent dissident creditors from using involuntary bankruptcy as a weapon against other creditors and the debtor when the debtor is seeking to pursue some voluntary reorganization with the cooperation of the vast majority of its creditors. When applying all the factors considered for abstention here, the Court believes abstention is appropriate. There is already an initiated state court proceeding that has teed up the very matters that Summit Glory hopes to pursue here. That forum is available to protect the interests of all parties. Therefore, these bankruptcy proceedings are not necessary for a just and equitable resolution, and there is a non-federal insolvency that precedes this case. And again, the purpose for which bankruptcy jurisdiction is sought is really to resolve what is essentially a two-party dispute.

Moving onto the request for costs, there is a presumption that costs and attorneys' fees will be awarded if an involuntary petition is dismissed. *See Crest One SpA v TPG Troy, LLC (In re TPG Troy, LLC)*, 793 F.3d 228, 235 (2d Cir. 2015). In awarding attorneys' fees and costs,

courts have adapted a totality of the circumstances test in which certain factors would be considered. *See id.* These factors include:

(1) the merits of the involuntary petition;

(2) the role of any improper conduct on the part of the alleged debtor;

(3) the reasonableness of the actions taken by the petitioning creditor or creditors; and

(4) the motivation and objectives behind the filing in the petition.

*Id.* When considering the first factor, the involuntary petition here, I've already found it doesn't satisfy the requirements. There's only one petitioning creditor who has made its intentions known that it wants to remove the Debtor from the premises.

The Court does recognize that the Petitioning Creditor is of the view that the Debtor has not paid any rent on the premises for an extended period of time. And that's the motivating factor. But really, the purpose for this filing in bankruptcy court is solely for a faster process. And so, in light of that, the Court finds that that weighs in favor and confirms the appropriateness of fees.

There is case law about a debtor being entitled to additional damages if the Court determines the involuntary petition was filed in bad faith. *See Lubow Mach. Co. v Bayshore Wire Prods.*, 209 F.3d 100, 105 (2d. Cir 2000). Bad faith is not defined in the Code, nor is there any legislative history to assist in determining whether it applies. But there are a number of tests that Courts have looked at. One is the improper use test, which finds bad faith when a petitioning creditor uses involuntary bankruptcy procedures in an attempt to obtain a disproportionate advantage for itself rather than protect against other creditors obtaining same. Second, there's an improper purpose test, which says bad faith exists if the filing of the petition was motivated by ill will, malice or a desire to embarrass or harass the debtor. Third, there's an

14

objective test for bad faith based on what a reasonable person would've believed. And fourth is done by modeling the inquiry after that used in Rule 9011. And these were all set forth in the *Bayshore Wire* case. *See Lubow Mach. Co. v Bayshore Wire Prods.*, 209 F.3d 100. Reviewing these tests, frankly, none of them fit the scenario. The Court doesn't believe Summit Glory was seeking to benefit at the expense of others. Instead, it was seeking to pursue a more expedited remedy than afforded in state court. The Court doesn't observe any ill will, malice, bad faith or anything that arises to the level of Rule 11, such that there is reason to impose additional damages beyond the traditional standard and contemplated costs and fees.

In reaching that decision, I understand that the pandemic has provided a tremendous number of challenges to debtors and to landlords. I think it's easy in this Court to understand the challenges to a debtor. But we see plenty of instances with the significant challenges to landlords who aren't getting paid, spaces sitting idle. And I can understand the desire for a more expedited process. But be that as it may, I don't think that reason by itself is an appropriate basis to keep this case here because otherwise it essentially argues for essentially any two-party landlord/tenant dispute to end up here in Bankruptcy Court as opposed to State Court. And that's not a tenable result, nor is it consistent with how an involuntary bankruptcy is supposed to work.

So, for all those reasons, I will grant the motion to dismiss. I'd ask the parties to work together on a proposed order granting the relief for the reasons set forth on the record here today. If there's a desire for an appeal, I'd ask if you let me know that, and I will take a look at the transcript and make sure to clean it up so that it could be followed by a judge who has not had the pleasure of reading all the papers here and sitting here this afternoon. That's my ruling.

## **CONCLUSION**

For the foregoing reasons, the motion to dismiss the involuntary petition is GRANTED.

Dated: White Plains, New York
       September 13, 2022

                                                      */s/ Sean H. Lane*
                                                      UNITED STATES BANKRUPTCY JUDGE